**Gerald M. SMITH, By and Through Eugene SMITH, Jr., as his Next Friend, Petitioner**

v.

**William ARMONTROUT, Respondent.**

No. 85–4647–CV–C–5.

United States District Court, W.D. Missouri, C.D.

April 5, 1986.

Richard Sindel, Sindel, Sindel & Sindel, St. Louis, Mo., for petitioner.

Kelly Mescher, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

Gerald Smith, a death row inmate at the Missouri State Penitentiary, has stated that he does not want to pursue his post-conviction remedies and that he wants to proceed

with his execution. The issue before the Court is whether Smith has the capacity to make a rational choice with respect to continuing or abandoning further litigation or whether he is suffering from a mental disorder which substantially affects his ability to make a rational decision. For the reasons set forth below, the Court finds that Smith's decision is based on rationality and is not the product of a mental disorder. Accordingly, the next-friend habeas corpus petition filed by Gerald Smith's brother must be dismissed for lack of standing.

## I. Background

In 1981, Gerald Smith was convicted and sentenced to death for the 1980 bludgeoning of one Karen Roberts. On direct appeal, Smith's conviction and death sentence were affirmed. *See State v. Smith,* 649 S.W.2d 417 (Mo.1983) (en banc). Smith next commenced a collateral attack on his conviction in the Circuit Court for the City of St. Louis pursuant to Mo.S.Ct.R. 27.26. Smith subsequently moved to dismiss that proceeding. On October 5, 1984, the state circuit court sustained that motion and dismissed the 27.26 proceeding without conducting a formal hearing on the issue of Smith's competency to waive his post-conviction remedies.[1] On October 9, 1984, the

Missouri Supreme Court held a special session and summoned Smith to appear before it. At that time, Smith advised the judges of that court of his wish to abandon further appeals.[2] The Missouri Supreme Court granted Smith's wish and set his execution for November 9, 1984.

On November 5, 1984, Gerald Smith's brother, Eugene, filed a next-friend petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On November 6, 1984, this Court found that a legitimate issue had been raised concerning Gerald Smith's competency[3] and, accordingly, entered an order staying Smith's execution pending resolution of the competency issue. *See Smith v. Armontrout,* 604 F.Supp. 840 (W.D.Mo. 1984). By agreement of the parties, Smith was transferred to the Federal Medical Center in Springfield, Missouri, for a comprehensive psychiatric examination and evaluation.[4] A hearing on the issue of Smith's competency was set for March 5, 1985.

Before the competency hearing took place, however, Smith changed his mind and announced that he wished to pursue his post-conviction remedies. Consequently, the competency question became moot

---

**1.** According to certified transcripts and docket sheets from the Circuit Court for the City of St. Louis, the only psychiatric evaluation introduced into the record was a report by Dr. S.D. Parwatikar dated July 23, 1984. That report found Gerald Smith to be competent. Significantly, two psychiatric reports finding Smith to be incompetent—one by Dr. Bruce Harry dated June 10, 1983, the other by Dr. Anasserial E. Daniel dated June 13, 1983—were not put before Circuit Judge Jean C. Hamilton, even though they were commissioned by and in the possession of the Missouri Department of Corrections.

**2.** According to certified transcripts and docket sheets from the Missouri Supreme Court, there again was no formal adversarial hearing concerning the issue of Gerald Smith's competency. Mr. Morris of the Missouri Attorney General's office informed the Court that the circuit court had dismissed Smith's 27.26 motion after finding Smith competent on the basis of Dr. Parwatikar's 1984 report. Again, there was no mention of the 1983 reports by Drs. Harry and Daniel. Smith was then asked by Chief Justice Rendlen if there was any reason why the Su-

preme Court should not set an execution date. Smith stated that he had nothing to say. With that, the special session of the Missouri Supreme Court was adjourned.

**3.** By that time, the 1983 reports of Drs. Harry and Daniel had come to light. Indeed, in a telephone conference conducted on November 6, 1984, Mr. Morris of the Missouri Attorney General's office conceded that it was appropriate to order a comprehensive psychiatric evaluation of Smith in view of the conflicting reports already in the record.

**4.** The staff of the Federal Medical Center was directed to evaluate Smith under the standard articulated in *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966). The staff also was directed to administer eight specific tests: (1) Minnesota Multiphasic Personality Inventory; (2) Wexler Adult Intelligence Test; (3) Thematic Apperception Test; (4) Rorschach Test; (5) Sentence Completion Test; (6) EEG with photic stimulation and hyperventilation; (7) CAT scan; and (8) full neurological examination for organic brain disorder.

and Gerald Smith was substituted for his brother as the sole petitioner. The Court thereupon treated Smith's case like any other habeas corpus proceeding. Several months later, it became apparent that Smith had not exhausted his state court remedies with respect to each of his claims for relief. Accordingly, pursuant to the rule of *Rose v. Lundy*,[5] this Court had no choice but to dismiss Smith's petition without prejudice and turn the matter over to state courts.

In the meantime, Gerald Smith once again announced that he wanted to abandon all further attacks on his conviction and death sentence. The Missouri Supreme Court promptly set January 6, 1986 as Gerald Smith's execution date. Eugene Smith quickly responded by filing a next-friend petition pursuant to Missouri Supreme Court Rules 27.26 and 52.02 on behalf of his brother in the Circuit Court for the City of St. Louis. In his petition, Eugene Smith alleged that Gerald Smith was not competent to make a rational decision about abandoning further appeals. At the same time, Eugene Smith filed a motion in the Missouri Supreme Court to stay Gerald Smith's execution pending a current evaluation of his competency. That motion was denied in one line and without any explanation.

Eugene Smith then went back to the Circuit Court for the City of St. Louis and obtained a ruling from Judge Hamilton of that court that a next-friend 27.26 petition was a viable procedure under Missouri law.[6] With Judge Hamilton's ruling in hand, Eugene Smith returned to the Missouri Supreme Court and renewed his motion for a stay of execution until the circuit court had a chance to resolve the question of Gerald Smith's competency. The Missouri Supreme Court, on its own motion, postponed the execution date until January 15, 1986. On January 8, 1986, however, the Missouri Supreme Court issued an order which held that the next-friend 27.26 proceeding in state court was a legal nullity and that no further extensions of Gerald Smith's execution date would be granted. The Missouri Supreme Court explained that, in its view, the October, 1984 state court ruling that Gerald Smith was competent foreclosed all further inquiry into the matter. Significantly, the Missouri Supreme Court did not hold a hearing or invite oral argument before handing down its decision.

In view of the Missouri Supreme Court's statement that there were no longer any state remedies available to Gerald Smith or his next-friend, the battleground returned to this Court. On December 27, 1985, Eugene Smith filed a brand-new next-friend petition in this Court. Once again, the threshold question before the Court was whether Gerald Smith was competent to waive his post-conviction remedies. On January 9, 1986—the day after the Missouri Supreme Court washed its hands of the Gerald Smith case—this Court was called upon to stay Smith's execution pending an up-to-date determination of his competency.[7] At the same time, the Court ordered

---

**5.** 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982) (federal court must dismiss a habeas corpus petition which contains one or more claims that had not been previously presented to the state courts).

**6.** Mo.R.Crim.P. 27.26(a) provides that the procedures for a 27.26 motion are "governed by the Rules of Civil Procedure insofar as applicable." Mo.R.Civ.P. 52.02, in turn, provides that a next friend may be appointed to prosecute a civil action on behalf of an incompetent person. Thus, as a matter of Missouri law, there is no apparent procedural obstacle to a next-friend 27.26 petition.

**7.** Significantly, during a telephone conference conducted that date with attorneys for the parties, the State did not suggest that this Court was bound by the Missouri Supreme Court's ruling that the issue of Gerald Smith's competency had been settled once and for all back in 1984. Nor would this Court have accepted such an argument. Under ordinary circumstances, a state court finding that Gerald Smith is competent would have been given full faith and credit by this Court. *See* 28 U.S.C. § 1738. Indeed, this Court would have been inclined to give an up-to-date competency determination by Judge Hamilton preclusive effect herein. *See* Restatement, Second, Judgments § 27 (stating the general rule of issue preclusion).

that Smith be transferred to the Federal Medical Center in Springfield, Missouri, for an updated examination and evaluation. A hearing was set for February 18, 1986.

The hearing commenced on schedule. The testimony of six expert witnesses was received in evidence.[8] The Court also received written reports compiled by three non-testifying experts—Dr. Daniel, Dr. Harry, and a clinical psychologist, Richard Fontana—as well as the written reports of the testifying experts, numerous medical records concerning Gerald Smith, and a variety of other documentary exhibits. In addition, two of Gerald Smith's fellow inmates testified specifically concerning Smith's behavior on death row and more generally about the conditions of confinement encountered by death row inmates. Finally, Gerald Smith testified in person for approximately three hours. The bulk of

However, there are four fundamental reasons why the October, 1984 state court competency finding cannot be given preclusive effect in this case. First, the 1984 state court determination is not sufficiently recent to be binding at the present time. The central issue is whether Gerald Smith *is* competent to forego his post-conviction remedies, not whether he *was* competent to do so at some point in the past. At the very least, the state courts should have inquired into whether any circumstances since October, 1984 have affected Smith's current mental condition.

Second, the Missouri Attorney General's office—the authorized representative for the State in this litigation—has not advanced an issue preclusion argument before this Court. Accordingly, any such argument has been waived by the State.

Third, the instant case falls within the exception to the general rule of issue preclusion set forth in the Restatement, Second, Judgments § 28(3) (new determination of an issue may be warranted by differences in the quality or extensiveness of the procedures followed in the two courts). As noted above, the state courts did not conduct formal adversarial hearings before concluding that Gerald Smith was competent to abandon further appeals, while this Court conducted a three-day adversarial hearing on the issue of Smith's competency. Similarly, there was no opportunity for discovery nor for the presentation of expert testimony in the state court proceedings, while this Court has allowed experts selected by the parties, as well as independent experts at the Federal Medical Center, to develop an extensive evidentiary foundation for evaluating Smith's competency. In view of the sharp contrast between the procedures used by this Court and those used by the state courts, this Court holds that the general rule of issue preclusion does not apply.

Fourth, and most important, the instant case also falls within a separate and distinct exception to the general rule of issue preclusion: relitigation of an issue is permissible where there is a transparent need for a new determination of the issue "because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action." Restatement, Second, Judgments § 28(5)(c). It bears emphasis that the October, 1984 competency finding by Judge Hamilton was based on a record which contained only one psychiatric evaluation, even though two other reports which had found Smith to be incompetent were then in the possession of the Missouri Department of Corrections. This Court cannot say that the State intentionally withheld these two reports from Judge Hamilton. In any event, however, the omission of the two reports from the state court record constitutes "other special circumstances" which cast doubt upon the "fullness and fairness" of the state court competency determination. In addition, the Court notes that it has recently come to light that, while Gerald Smith's case was pending before the Missouri Supreme Court in January, 1986, one of the judges on that court initiated *ex parte* communications with one of the psychiatrists who had examined Smith. Such *ex parte* contact not only violates that court's own canons of ethics, *see* Mo.S.Ct.R. 2, Canon 3(A)(4) (prohibiting judges from initiating *ex parte* communications concerning pending proceedings), it also strikes at the very heart of the adversarial system. Nothing can undermine the fairness of a judicial proceeding more than when a judge turns his back on the adversary system—where each side has an equal opportunity to test its opponent's evidence by means of cross-examination—and conducts his own *ex parte* investigation of the facts. *See Reserve Mining Co. v. Lord*, 529 F.2d 181, 184–88 (8th Cir.1975). Under these extraordinary circumstances, it clearly appears that the state court's conclusion concerning Smith's competency was not the product of a full and fair hearing; accordingly, this Court is not bound by the state court's resolution of the competency issue.

8. Two expert witnesses testified on behalf of Eugene Smith: Dr. Ellis A. Perlswig and Dr. Richard A. Ratner. Two experts testified on behalf of the State: Dr. S.D. Parwatikar and Dr. Z.A. Ajans. The last two testifying experts—Dr. Clayton A. Pettipiece and Dr. Daniel V. Foster—are on the staff of the Federal Medical Center and became involved in the case as a result of the Court's order transferring Smith to that facility.

Smith's testimony came during cross-examination by petitioner's counsel.

Overall, the adversary hearing lasted approximately three full days. The testimony of the witnesses covered Gerald Smith's entire life, from his early childhood to his very recent past. Although some of the evidence received was not particularly helpful, the hearing demonstrated that the question of Smith's competency was a close one. More importantly, perhaps, the hearing also demonstrated the irreplaceable value of the adversary system as a tool for ascertaining the "truth."[9] Although no one will ever be able to say with absolute certainty whether or not Gerald Smith is competent to waive his post-conviction remedies, this Court is now prepared to tackle this threshold question with the confidence that its decision is based upon complete information.

## II. The Issue

As noted above, the issue presently before the Court is whether Gerald Smith has the capacity to make a rational choice with respect to continuing or abandoning further litigation or whether he is suffering from a mental disorder which substantially affects his ability to make a rational decision. According to the Court's research, this standard was first articulated by the United States Supreme Court in *Rees v. Peyton*, 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583 (1966) (per curiam). Since *Rees*, several federal courts have been confronted with the situation now facing this Court and, in each instance where there was at least some evidence of incompetence, the court has faithfully analyzed the issue after conducting an evidentiary hearing.[10] Over the last twenty years, the courts have come to describe the issue as whether or not the death row inmate is "competent" to forego his post-conviction remedies.[11]

■ Although the issue has been phrased in terms of "competency," it is important to note that the applicable standard is not the same as the standard for determining whether a criminal defendant is competent to stand trial.[12] Nor is the crucial issue whether or not Gerald Smith can be classified as "mentally ill."[13] Instead, the central question is whether Gerald Smith's decision to forego further ap-

---

**9.** The adversary system is based upon the idea that, in an open forum where each party is allowed to present its own information and test the other's information, the "truth" will rise to the surface. The "truth" in this case, as in many cases, cannot be known with absolute certainty. In such a case, it is imperative that the factfinder refrain from adopting a partisan position and investigating the facts for itself. Those roles are for the advocates, not the Court. And, it is even more important that the factfinder base its decision on a complete record. For only after all of the evidence has been heard can a Court say with confidence that justice was done.

**10.** *See, e.g., Groseclose ex rel. Harries v. Dutton*, 594 F.Supp. 949 (M.D.Tenn.1984); *Rumbaugh v. Estelle*, 558 F.Supp. 651 (N.D.Tex.1983).

**11.** *See, e.g., Rumbaugh v. Procunier*, 753 F.2d 395, 398–99 (5th Cir.1985); *Hays v. Murphy*, 663 F.2d 1004, 1009 (10th Cir.1981).

**12.** The standard for competency to stand trial is whether the defendant is "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to

assist properly in his defense." 18 U.S.C. § 4241. That standard does not focus on the ability of the defendant to engage in a rational decision-making process; instead, it centers on the defendant's ability to appreciate his predicament. In contrast, the *Rees* standard deals with the death row inmate's decision-making process. In short, the "competency to stand trial" standard is a test of passive rationality, while the "competency to forego appeals" standard is a test of active rationality. Here, there is no dispute but that Gerald Smith is factually aware of his circumstances. He is at least factually aware that he is advancing his execution date by abandoning further appeals. Despite that factual awareness, however, Smith still may be "incompetent" to forego his post-conviction remedies if his decision is not a rational one.

**13.** The term "mental illness" generally denotes a severe psychological disturbance characterized by hallucinations or other symptoms manifesting a substantial disassociation from reality. Under *Rees*, however, it is sufficient that the death row inmate "is suffering from a mental disease, disorder, or defect." 384 U.S. at 314, 86 S.Ct. at 1506. As all of the experts in this case agreed, a "mental disorder" is not nearly as severe as a "mental disease" or "mental illness."

peals is based on a rational thought process or whether his decision is a product of a mental disorder. It bears emphasis that the key to this issue is the rationality underlying Gerald Smith's decision.[14] In order to find that Smith's decision is rational, however, this Court need not agree that Smith's decision is the "correct" one or the "best" one; the question is only whether or not his decision is based on a rational understanding of the circumstances before him.

### III. The Evidence

The story of Gerald Smith is a true-life tale of a boy who never grew up. Smith was born in St. Louis, Missouri, on October 7, 1958. He was the third of nine children. As a young child, Smith sustained several serious head injuries. When he was less than two years old, he was admitted to St. Louis City Hospital for lead poisoning. The lead level in his body was dangerously high. No one knows if that incident had any long-term effects.

Smith's family life was disruptive and unstable. His father was an alcoholic who frequently beat both mother and children. On several occasions, Smith's mother would take the children and move away from the father, only to later return. Once, the mother ran away with the children to California. The father found them in a motel and there was a reconciliation. The mother and father left the motel for a while. Meanwhile, someone reported to the authorities that a group of children had been left unattended at the motel. The police picked the children up. They remained in the custody of the State for a week before being reunited with their parents. The family returned to St. Louis. They continued to change addresses every six months.

Smith began playing hookey from school and running away from home at age 7. At age 10, he became a petty thief. At age 13, he began using drugs and alcohol. He quit going to school after the eighth grade.

At age 15, Smith began getting into more serious trouble and was sent to the Missouri Hills School for Boys, a juvenile detention facility. After being released, Smith floated along aimlessly. He continued to steal to earn money. He never worked a steady job. He had a girlfriend whom he abused physically. He never had a stable relationship with his girlfriend even though she bore his child, Tina, on July 23, 1979.

Smith was arrested on eight separate occasions between September, 1979 and August, 1980. He was admitted to the Alexian Brothers Hospital in St. Louis in 1980 after he threatened to commit suicide by jumping off a three-story building. Smith was diagnosed as suffering from depression and a personality disorder. One examiner noted that Smith's "chronic obsessive thinking of hostile thoughts and activity is a problem of mammoth proportions." Another stated that Smith was "really a total catastrophe." He was finally released from the hospital, despite the fact that his prognosis was extremely poor.

On September 8, 1980, Smith committed the murder for which he now faces the death penalty. He killed the victim, Karen Roberts, with a heavy iron bar. Smith said he killed her because she gave him a dose of the clap which caused his fiance (and the mother of his child) to leave him.

According to the testimony at the competency hearing, Smith's attorney and the St. Louis City prosecutor were on the brink of striking a deal for a second-degree murder guilty plea. Before the plea bargain was finalized, however, a devastating admission by Smith came to light. In a letter to the *St. Louis Globe-Democrat*, which at that time was a major St. Louis newspaper, Smith wrote:

"I Gerald Smith killed Karen Roberts. I have been looking for her for 4 months so I could kill her. On September the 8, 1980, I finally got my chance to kill her

---

**14.** *See Rumbaugh v. Procunier,* 753 F.2d 395, 398 (5th Cir.1985); *id.* at 404 (Goldberg, J., dissenting).

and I done just that. I had a gun on me at the time but I thought shooting her would be to damn good for her. I wanted her to feel some pain so I beat her little lousy head in. If she were living now I would do it all over again."

The letter was signed "Gerald Smith, the cold blooded killer." After learning about the letter, the prosecutor called off all plea negotiations. Smith was charged with and convicted for capital murder.

At the competency hearing, Smith testified that, in fact, he had not planned to kill Karen Roberts. He also stated that he did not really have a gun on him at the time. When asked why he wrote those things in the letter which effectively sealed his fate, Smith testified that he did not know.[15]

Smith's pattern of self-defeating behavior continued after his conviction. At first, he announced that he did not want to pursue a direct appeal. He wrote several letters to the Missouri Supreme Court in which he called them a variety of vulgar names and dared them to execute him before hearing his appeal. He even threatened to kill his attorneys and prison guards if the Missouri Supreme Court did not allow him to forego the appellate process.

After the Missouri Supreme Court ruled that an appeal was mandatory in all death penalty cases, however, Smith's attitude softened. As long as he was being forced to appeal, he wanted the appeal to be successful. It was not. Smith then authorized his attorneys to file a 27.26 motion on

his behalf. Approximately one year later, he changed his mind again and dismissed the 27.26 proceeding. Since then, he has flip-flopped once more: on March 5, 1985, Smith stated that he wished to pursue his federal post-conviction remedies, but some three months later, he changed his mind again.

All of the experts who examined Smith noted that this pattern of impulsive and erratic behavior is one of the earmarks of his personality. Another primary characteristic of Smith's personality is low self-esteem which has manifested itself in self-mutilating behavior and four suicide attempts.[16] A third dominant personality trait of Smith is that he likes to present a macho image, one that is invulnerable to fear, compassion, or remorse.[17]

Petitioner's theory is that these three personality traits prevent Smith from making a rational decision concerning his appeals. Petitioner characterizes Smith's decision as an impulsive one, a self-destructive one, and one that he cannot back down from without showing fear. In contrast, respondent's position is that, notwithstanding Smith's mental and emotional difficulties, his decision is based on a rational assessment of his circumstances. At the competency hearing, Smith stated that he preferred the death penalty over life imprisonment. He acknowledged that the United States Supreme Court is presently considering a case[18] which, if affirmed,

---

**15.** In 1983, Smith had told Dr. Harry that he wrote the *Globe-Democrat* letter "because I wanted to die. I made all those things up because I wanted to give them a reason to send me to the gas chamber."

**16.** On February 23, 1981, a guard at the St. Louis City jail reported multiple self-inflicted lacerations on Smith's right wrist. On July 14, 1982, a guard at the Missouri State Penitentiary found a blood-soaked t-shirt and traced the garment to Smith. The guard went to Smith's cell and discovered that he had used pieces of a mirror to cut his right wrist and forearm numerous times. In addition, Dr. Harry reported that Smith confessed to burning his chest with cigarettes as a form of self-torture. Smith testified that he did those things when he felt down.

Although Smith was more reluctant to acknowledge his suicide attempts, Dr. Daniel reported that Smith had tried to kill himself at least three times before his arrest. On May 26, 1983, Smith tried a fourth time, this time by taking between 20 and 60 pills of Elavil. Although Smith now claims that he took the overdose "to get high," it is the Court's belief that this was a suicide attempt.

**17.** For example, Dr. Daniel reported that Smith said of his decision to abandon further appeals, "I would rather let them kill me than say I was scared."

**18.** *See Grigsby v. Mabry*, 758 F.2d 226 (8th Cir. 1985), *cert. granted sub nom. Lockhart v. McCree*, —— U.S. —— 106 S.Ct. 59, 88 L.Ed.2d 48 (1985).

might entitle him to a new trial; but he also noted that, even with a new trial, there is no realistic chance of avoiding a guilty verdict. Consequently, he stated that he might as well accept his death sentence, since his only real options are the gas chamber or life in prison.

## IV. The Experts

To a surprising extent, the experts who examined Gerald Smith are in agreement as to the nature and severity of Smith's basic psychological problems. For example, all of the experts agreed that Smith does not suffer from a mental disease [19] or defect.[20] Similarly, all of the experts found that Smith suffers from a borderline personality disorder.[21] That disorder is marked by Smith's impulsivity, his inability to control himself, and his dependence on others for guidance. In Freudian terms, this condition can be described as an inability to control one's "Id." It is similar to childishness, but it is exacerbated by the guilt and frustration that an adult feels over not being able to control oneself.

A second diagnosis cited by most of the experts is that Smith suffers from an antisocial personality disorder. As a result of this disorder, Smith does not feel bound by society's rules. Indeed, he often feels compelled to break the rules and seems to enjoy thumbing his nose at "the system." As Dr. Foster explained, this disorder can trace its roots back to Smith's history of truancy, drug use, and juvenile delinquency.

The third diagnosis mentioned by virtually every expert is that Smith has a history of depression. This condition is closely related to Smith's low level of self-esteem and has been overtly manifested in his self-mutilating behavior and suicide attempts. The experts were not able to agree, however, on the degree and permanence of Smith's depression. For example, petitioner's experts characterized Smith's depression as a chronic condition of moderate severity, while Drs. Foster and Pettipiece felt that Smith seemed to be moderately depressed during the December, 1984 examination, but showed no signs of clinical depression during the most recent examination.[22]

A fourth area of agreement among the experts is their common conclusion that borderline personality disorders, antisocial personality disorders, and depression are all "mental disorders" within the meaning of *Rees v. Peyton*.[23] Despite this agreement, however, there was a sharp disagreement in the experts' assessments of the relationship between Smith's mental disorders and his decision to forego further appeals: Drs. Daniel, Harry, Perlswig, and Ratner were of the opinion that Smith's decision is a direct result of his mental disorders, while Drs. Ajans, Foster, Parwatikar, and Pettipiece felt that, notwith-

---

**19.** The term "mental disease" was defined by the experts as a mental condition which causes a person to lose contact with reality and be unable to cope with day-to-day living. Mental diseases generally require hospitalization. Psychosis and schizophrenia are mental diseases. A severe form of depression, accompanied by hallucinations or delusions, also may be classified as a mental disease. Characterization as a mental disease is largely a matter of degree. None of the experts in the instant case felt that Smith's condition was severe enough to be categorized as a mental disease. Although he has been known to explode in fits of rage which might be classified as psychotic episodes, he is generally oriented to his surroundings and able to deal with his day-to-day existence.

**20.** The term "mental defect" refers to conditions, such as mental retardation, which are directly linked to physical abnormalities in the brain.

**21.** The term "borderline personality" derives from the fact that the subject is always very close to the edge of being out of control. One minute, the subject may appear to be a mature adult, while the next minute and at the slightest provocation, he may fly into a terrible rage.

**22.** Dr. Foster explained that, during the earlier examination, Smith's appearance was unkempt, his speech was slurred, and he seemed despondent. In contrast, at the more recent examination, Smith was brighter and more alert, his appearance was much neater, and he seemed to have a better sense of humor.

**23.** Only Dr. Pettipiece disagreed with this conclusion.

standing Smith's problems, his decision is based on rationality.

Drs. Daniel and Harry both examined Smith in May and June of 1983. Dr. Daniel reported that Smith was an impulsive, impatient, and immature individual who often says and does things for no apparent reason and then stubbornly stands by them. For example, Smith said of his decision to forego further litigation, "I don't think [my decision] is the right one; I know it ain't the right one. I just gone so far already. I would rather let them kill me than say I was scared." Dr. Daniel noted that Smith had started down a self-destructive path by writing the *Globe-Democrat* letter in which he described himself as a "cold blooded killer," and concluded that Smith's latest decision was merely the final step down that path. Similarly, Dr. Harry found that Smith's decision to abandon his appeals was based not on rationality but on "his need to self-destruct, stubbornness, and failure to plan ahead."

Significantly, the reports of Drs. Daniel and Harry were compiled shortly after Smith's drug overdose suicide attempt. Neither of these experts examined Smith after June of 1983. The Court has considered these reports as important background information. They were not given great weight, however, because they may well have been colored by Smith's suicide attempt and are quite remote in time from Smith's present mental status.

Dr. Ratner, a Washington, D.C. psychiatrist, testified by way of a videotape deposition. He examined Smith in person for two hours on February 15, 1986. His initial clinical impressions were that Smith is im-

mature, impulsive, and distant. His current diagnosis is that Smith suffers from chronic depression and a borderline personality disorder. Dr. Ratner testified that Smith has a general feeling of worthlessness, a feeling which is exacerbated by the miserable living conditions on death row.[24] Smith is not the type of person who ruminates over his depression, however. Instead, Dr. Ratner noted, Smith tends to "act out"—that is, he tends to respond instinctively and impulsively to his depression by engaging in overt actions such as his self-mutilating behavior and suicide attempts.

Dr. Ratner also felt that Smith tends to engage in extreme, dramatic behavior in an effort to draw attention to himself. In Dr. Ratner's opinion, Smith is so psychologically weak and so dependent on others for support that he would rather gain their attention by doing something bad than risk being ignored. At the same time, Dr. Ratner stated, Smith is so afraid of his dependency on others that he projects an exaggerated macho persona in order to avoid dealing with his fear. Dr. Ratner explained that there was a strong parallel between Smith's self-mutilating behavior and his decision to abandon his appeals: in each instance, the action is motivated by a very low sense of self-worth yet is legitimized by Smith's feeling that he has thereby shown the world that he "can take it like a man." This decision-making process, Dr. Ratner concluded, is not a rational one.

Dr. Perlswig, a psychiatrist from New Haven, Connecticut, similarly concluded that Smith's decision was not based on

---

**24.** According to the testimony of Dr. Foster and two inmates, A.J. Bannister and Emmet Nave, the conditions on death row are deplorable. Each inmate spends over twenty-three hours a day in an 8' × 9' cell. The inmates are allowed, at most, a 45-minute outdoor exercise period three times per week and a 45-minute exercise period on a weight machine on an alternating basis. They are allowed three showers per week. The poor drainage in the shower area causes a back-up of stagnant water. There is a constant stench on death row because raw human sewage backs up in the plumbing system and floods some of the cells on a daily basis.

There is no ventilation and no natural light. Each cell is lit by a single low-wattage bare bulb suspended some thirteen feet from the ground. There is an infestation of rats, roaches, and other pests which prison officials allegedly have refused to control. The food served to death row inmates is usually served cold and often has roach parts and other foreign substances in it. For the purposes of evaluating the effect of death row living conditions on Gerald Smith, the Court has assumed that these conditions are violative of the Cruel and Unusual Punishment Clause of the Eighth Amendment.

rationality. Dr. Perlswig noted that Smith, who has never really been in control of his own life, seems to enjoy controlling the situation for a change. Dr. Perlswig also felt that Smith's decision is based, at least in part, on an "I dare you to kill me" mentality.[25] Like Dr. Ratner, Dr. Perlswig believed that Smith was a weak and dependent individual who covered up for his inadequacies by projecting an exaggerated macho personality. Smith's decision, Dr. Perlswig concluded, was not based on rationality but instead was based on his perception of appealing as a form of "begging for mercy" and on the fear that he would be seen as a weakling if he pursued an appeal.

The State's experts are in essential agreement with the notion that Smith suffers from various mental disorders; however, they disagree with the conclusion that Smith's decision is a product of those disorders. Dr. Ajans first examined Smith in October, 1984, and found that Smith suffered from an anxiety and depression disorder, a borderline personality disorder, and an antisocial personality disorder. Dr. Ajans re-examined Smith in February, 1986, and found that Smith's mental condition had improved dramatically. Dr. Ajans felt that Smith was no longer depressed and that, despite his antisocial and borderline personality disorders, Smith's decision to abandon his appeals was based on a rational appreciation of his situation. Dr. Ajans observed that, in Smith's mind, life in prison is not worth living. In making this observation, Dr. Ajans acknowledged that the conditions on death row probably had some effect on Smith; still, the expert testified, it is the *fact* of confinement, not the conditions of confinement, that is motivating Smith. Since Smith's only realistic hope is to receive a life sentence instead of the death penalty,[26] Dr. Ajans concluded, his decision to get the matter over with is a rational one.

Dr. Parwatikar, who has examined Smith on four separate occasions, also concluded that his decision was a rational one. Dr. Parwatikar acknowledged that Smith had a history of acting impulsively and dramatically in order to get attention. Dr. Parwatikar also noted that Smith had considerable mental and emotional problems, including chronic mild depression, a borderline personality disorder, and a tendency to act out in a self-destructive manner. Nevertheless, he found that Smith's decision was based on the realization that he had no chance of avoiding a minimum sentence of life imprisonment[27] and that the death penalty was preferable to spending a minimum of fifty years in jail. Dr. Parwatikar emphasized that, while others may disagree with Smith's decision, it is based on a rational thought process of recognizing his options and making a choice based on available information.

Drs. Foster and Pettipiece—the two independent experts from the Federal Medical Center in Springfield, Missouri[28]—also

---

**25.** This defiant attitude was most clearly evidenced by Smith's letters to the *Globe-Democrat* and the Missouri Supreme Court. Dr. Perlswig hypothesized that this attitude developed when, as an abused and neglected child, Smith learned not to trust anyone and to always expect the worst.

**26.** The minimum sentence for a capital murder conviction is life imprisonment with no possibility of parole for fifty years. Mo.Rev.Stat. § 565.008.

**27.** Dr. Parwatikar explained that the inevitability of a lifetime in jail was based on two factors. First, the *Globe-Democrat* letter all but insures a capital murder conviction in any new trial concerning the Karen Roberts killing. Second, Smith has been implicated in the November,

1985 stabbing death of another death row inmate, Robert Allen. Thus, even if Smith could somehow avoid a capital murder conviction vis-a-vis the Karen Roberts killing, he still would face yet another capital murder prosecution in connection with the Robert Allen killing.

**28.** The fact that these two experts became involved in this case at the request of the Court and not at the request of the parties greatly enhanced their credibility. Unfortunately, Dr. Pettipiece did not seem to have given this case much consideration and his testimony often was difficult to follow. Dr. Foster, on the other hand, was the most conscientious and helpful of all the experts. Dr. Foster testified that he had spent some 80 hours on this case, far more than any of the other experts. He also indicated that he did not enter the case with any preconceived

found that Smith was competent to forego his post-conviction remedies. Dr. Foster testified that Smith was cognitively aware of his legal situation. As evidenced by his above-average scores on the Wexler Adult Intelligence Test and the Sentence Completion Test, Smith clearly has the ability to take in and assimilate information. Moreover, with respect to the specific issue at hand, Dr. Foster found that Smith has a good understanding of the appellate process and of his future prospects in that process. For example, Smith understands that the most he can hope for from this Court is a new trial. Smith also is aware that the result of any new trial is not likely to be different from the result of his first trial.[29] Dr. Foster emphasized that Smith likes being free and hates being confined. Consequently, he concluded, Smith's decision to accept the death penalty is a rational response to his situation.[30]

Dr. Foster acknowledged that he could not be absolutely certain if the reasoning Smith has articulated accurately reflects his actual thought process. For example, Dr. Foster noted that Smith has a long history of impulsive, erratic, and self-destructive behavior. In Dr. Foster's opinion, however, Smith's decision to abandon his appeals was qualitatively different. Dr. Foster observed that Smith had to be very certain of and committed to his decision in order to endure the humiliation and public spectacle of a competency hearing in which every detail of his life would be analyzed by a group of strangers. Consequently, deferring to Smith's essential dignity as a human being, Dr. Foster concluded that he was competent to abandon his appeals.

## V. Findings of Fact

1. Gerald Smith does not suffer from any mental disease or defect.

2. Gerald Smith does suffer from three mental disorders: an antisocial personality disorder, a borderline personality disorder, and chronic mild-to-moderate depression.

■ 3. Notwithstanding his mental disorders, Gerald Smith is competent to forego further review of his capital murder conviction and death sentence. As noted above, the crucial question is whether Smith's decision is based on a rational thought process on the one hand or whether it is a product of his mental disorders on the other hand. Necessarily, this issue cannot be resolved with absolute certainty: no one can be sure of what goes on in the human mind. Nevertheless, after hearing all of the evidence and reviewing all of the documents submitted by the parties, the Court has the firm belief that Smith's decision is based on rationality.

The Court acknowledges that Smith has made a number of rash, irrational, and self-destructive decisions in the past—most notably, his decision to send the *Globe-Democrat* letter. The Court also observes that there is a great temptation to draw a strict analogy between Smith's past irrational acts and Smith's present decision to abandon his appeals. In the Court's view, however, such an analogy is not warranted by the record. There was no rational basis whatsoever underlying Smith's decision to send the *Globe-Democrat* letter; Smith himself admitted that he sent the letter to make sure that he would receive the maximum penalty. In sharp contrast, Smith has shown that he has a good under-

notions and that he wrestled with the competency question for many hours. The Court is very appreciative of the effort put forth by Dr. Foster.

29. Dr. Foster testified that Smith was keenly aware of the "bridges he has already burned." By this, Dr. Foster was referring to the *Globe-Democrat* letter and other inculpatory admissions by Smith which effectively render him defenseless against the death penalty.

30. Dr. Foster explained that Smith's situation is analogous to the position of a terminally ill individual who must decide whether to undergo chemotherapy. Like the terminally ill person, Smith has an option available which might prolong his life. However, the treatment might be worse than the disease: just as chemotherapy can be excruciatingly painful, the uncertainty and delay of the appeals process can create tremendous stress in the mind of a death row inmate.

standing of his present legal position.[31] Smith also has indicated that he has considered the matter and would rather accept the death penalty than continue struggling for a life sentence. Although the Court does not necessarily agree with Smith's choice, it cannot say that his choice is irrational.

In short, Smith has dug himself into a hole so deep that it is now rational for him to give up the fight. The critical distinction is that, while a false sense of hopelessness is a sign of a mentally disturbed individual, Smith's present sense of hopelessness is a reasonable assessment of his situation. It is true that Smith has acted self-destructively in the past; nevertheless, the Court is convinced that Smith's present decision is based on a rational evaluation of his own best interests. In essence, Smith feels that it is better to accept the sentence imposed on him rather than engage in a stressful and futile struggle against the inevitable. While most death row inmates choose to fight their sentences to the bitter end, the Court will not rule that Smith is incompetent merely because he sees things differently.

■ 4. Gerald Smith's decision to forego his post-conviction remedies is a voluntary one. Although there was considerable evidence showing that life on death row is dismal, the Court finds that the conditions of Smith's confinement do not render his decision involuntary for two reasons.[32] First, he has stood by his decision even though he has been incarcerated in the Special Management Unit (SMU) of the Missouri State Penitentiary since November, 1985. As noted by Dr. Foster, the conditions in SMU are much better than the conditions on death row. The fact that Smith has not renounced his decision since his transfer to SMU indicates that his decision is not significantly affected by the conditions on death row.

Second, the Court is inclined to agree with Drs. Foster and Ajans that it is the fact of confinement, not the conditions of confinement, which Smith finds most oppressive. Dr. Foster noted that Smith's philosophy is similar to the New Hampshire motto, "Live Free or Die." While many inmates seem to thrive in an institutional environment, Smith is the type of individual who finds it intolerable to be physically confined under any circumstances.[33] Thus, while the deplorable conditions on death row undoubtedly have had some effect on Smith, they do not render his decision to abandon his appeals involuntary.

## VI. Conclusions of Law

1. The Court has jurisdiction to determine whether it has jurisdiction over this cause. *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 695, 91 L.Ed. 884 (1947).

■ 2. In analyzing the competency issue, the Court has assigned the burden of persuasion to the State.[34]

---

**31.** It is beyond dispute that, at best, Smith can hope to obtain a life sentence instead of the death penalty.

**32.** The State maintains that the Court should not address the voluntariness issue in the first place because a claim of involuntariness cannot be raised in a third-party habeas corpus petition. The Court does not agree. Smith's decision to forego his post-conviction remedies is, in effect, a waiver of his constitutional right to pursue a writ of habeas corpus. Before such a waiver can be accepted, the Court must make certain that it was given knowingly, voluntarily, and intelligently. Thus, if Gerald Smith's decision to abandon his appeals was coerced out of him as a result of unconstitutional conditions on death row, that fact would render his deci-

sion legally ineffective. The Court would never be able to make such a determination, however, if the State was correct in asserting that the voluntariness issue cannot be raised by a third-party. Therefore, the Court holds that it has jurisdiction to determine whether Smith's decision is a voluntary one, for only if his decision is free from coercion can it truly be *his* decision.

**33.** This anti-institutionalization attitude goes back to Smith's early years when he frequently skipped school and ran away from home.

**34.** The other courts which have considered this issue have held that the petitioner bears the risk of non-persuasion on the competency issue. *See Groseclose ex rel. Harries v. Dutton*, 594

■ 3. Because the Court finds that Gerald Smith is competent to abandon his appeals, Eugene Smith lacks standing to bring a third-party habeas corpus proceeding. Accordingly, this case must be dismissed. *See Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. ·436, 439, 50 L.Ed.2d 632 (1976) (Burger, C.J., concurring).

### VII. Conclusion

In summary, the Court holds that Gerald Smith is competent to waive further review of his capital murder conviction and death sentence. As a personal matter, I regret that the path will be cleared for the State to execute Smith as a result of this ruling. Nevertheless, the constitutionality of the death penalty has already been decided and is not a matter for this Court to second-guess. The only issue before this Court is whether Smith's decision to abandon his appeals is a rational one.

The Court has struggled with this case for many hours—indeed, for many weeks. The most regrettable aspect of this case is that, as a result of his parents' irresponsibility, Smith was never given a chance to develop into a mature, decent human being. I have often wondered what possesses people to bring children into this world only to abandon them, either physically or emotionally. I also wonder what will make them stop. In the meantime, the cycle of life goes on.

In accordance with the foregoing, it is hereby

ORDERED that the petition for a writ of habeas corpus filed by Eugene Smith on behalf of Gerald Smith is dismissed for lack of standing. Each party shall bear its own costs.

It is further

ORDERED that the stay of execution issued by this Court on January 9, 1986, shall continue with full force and effect until April 21, 1986, in order to permit petitioner to file an appeal.

F.Supp. 949, 953 (M.D.Tenn.1984). Nevertheless, this Court firmly believes that the burden of persuasion on the competency question must be allocated to the State, at least in a death penalty case. The primary function of allocating the burden of persuasion is to put the risk of error on one party on the other. In an ordinary civil case, the burden of persuasion is on the plaintiff because the plaintiff is the party seeking to alter the status quo. In a criminal case, the burden is on the government to prove the defendant guilty "beyond a reasonable doubt" because of the idea that it is better to acquit a hundred guilty men than to convict one innocent man. In the instant case, the Court similarly believes that it is better to err on the side of caution. Considering the irreversible nature of the death penalty, the Court has endeavored to resolve all doubts in favor of finding Smith incompetent. *See generally Rumbaugh v. Procunier,* 753 F.2d 395, 414–15 (5th Cir.1985) (Goldberg, J., dissenting).