**Gerald SMITH, Petitioner,**

v.

**William ARMONTROUT, et al., Respondents.**

**No. 87–4336–CV–C–5.**

United States District Court, W.D. Missouri, C.D.

Aug. 11, 1988.

Lew Kollias, Columbia, Mo., Richard Sindel, Sindel & Sindel (Advisory only), Clayton, Mo., for petitioner.

Stephen D. Hawke, Asst. Atty. Gen., State of Mo., Jefferson, Mo., for respondents.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

Before the Court is petitioner's motion, pursuant to 28 U.S.C. § 2254, for a writ of *habeas corpus*. Petitioner is currently incarcerated on Death Row at the Missouri State Penitentiary awaiting execution based upon a death sentence imposed for capital murder.

On July 11, 1988, a one-day hearing was held before the undersigned Judge, in which counsel for both petitioner and respondents presented evidence and witnesses on the issues raised by petitioner. Following this hearing, the Court took petitioner's application for habeas relief under advisement. For the following reasons, the Court concludes that petitioner's application for a writ of *habeas corpus* must be denied.

### I. *Factual Background*

Petitioner Gerald Smith was charged by indictment on October 16, 1980, with capital murder. A jury trial was held on June 1, 1981 in the Circuit Court of the City of St. Louis, before the Honorable Carl R. Gaertner. At the close of the evidence, instructions and arguments of counsel, the jury found appellant guilty of capital murder. Following the punishment phase of the trial, a jury returned a sentence of death.

Evidence presented at the trial established that at approximately 8:00 p.m. on September 8, 1980, petitioner and Dana Osia, a girl he had known about four years and had been dating for a week, went driving in Dana's car. After an hour or so, defendant announced his intention to visit a person whom he said was his cousin. Petitioner told Dana he was going to hurt this person because she had given him "the clap." At approximately 9:30 p.m., petitioner and Dana drove to the home of Karen Roberts, where defendant invited Karen to take a ride.

Initially, Karen Roberts refused, but petitioner persuaded her to go. After driving about for another hour or so, the three stopped near petitioner's house and talked for a while. During the conversation, petitioner asked Dana four times to go home; Dana finally agreed to leave. Although Dana offered to drive Karen home, Karen was persuaded to stay by petitioner, and Dana left alone.

Sometime after Dana's departure, petitioner left his house with Karen Roberts to walk her home. According to petitioner's subsequent confession, during the walk they argued about whether Karen Roberts had given petitioner a venereal disease. At one point, Karen cursed him, and petitioner pushed her to the ground. When she got up, Karen was holding a heavy metal bar which she swung at petitioner. Petitioner blocked the blow and jerked the bar away. When Karen started to run, petitioner chased Karen Roberts across the street, north for half a block, east for half a block to some railroad tracks, north along the tracks for a full block and across another street, where he finally caught her. There, petitioner bludgeoned Karen to death with the metal bar. An autopsy on the body of Karen Roberts revealed massive head injuries. The back of her skull was caved in; she suffered six head lacerations, skull fractures "too numerous to count," and multiple contusions and bruises of the brain beneath the skull. These injuries were consistent with multiple blows, inflicted with the heavy iron bar identified as the murder weapon. Any one of the blows could have rendered Karen unconscious or caused her death. Karen also suffered abrasions on her face and contusions of the shoulder, arm, hip and thigh. On a scale of "one to ten," an expert witness rated the seriousness of Karen's injuries at "eight."

Dana next saw petitioner on the evening of September 9, 1980, when she, petitioner and petitioner's brother, Eugene, went driving. At one point, Eugene left the car to go into a liquor store, and petitioner told Dana he had killed the girl they picked up

the night before, which was why he had wanted her to leave. When Dana did not believe he had committed a murder, petitioner showed her a newspaper story about the killing. Nine days later, petitioner was arrested. After receiving *Miranda* warnings and executing a waiver, petitioner initially denied committing the murder, but later orally admitted that he killed Karen Roberts and gave a detailed statement of the events described above. Petitioner also accompanied police officers to the murder scene, where he assisted the police in locating and identifying the iron bar he used to kill Karen Roberts. The bar was approximately 18 1/2 inches long and weighed about eight pounds. Petitioner was charged with capital murder.

A few months later, after petitioner's arrest for Karen Roberts' murder, petitioner's attorney and the prosecution were on the verge of entering a plea-bargain agreement for a second-degree murder plea. These plea negotiations were ended after the prosecution learned that petitioner allegedly sent a hand-written letter to a St. Louis newspaper, the *St. Louis Globe–Democrat*, on March 14, 1981. This letter was published by the newspaper and read:

"You people wrote the story on me back in September all wrong. So I am giving you the real story.

I, Gerald Smith, killed Karen Roberts. I have been looking for her for 4 months so I could kill her. On September the 8, 1980, I finally got my chance to kill her and I done just that. I had a gun on me at the time. I thought shooting her would be too damn good for her. I wanted her to feel some pain so I beat her little lousy head in. If she were living now I would do it all over again. She gave me a dose of the clap back in April, 1980, and because of that my feiancee (sic) Joyce Dodson left me over it. I planned on killing her ever since.

Gerald Smith
the cold-blooded killer."

Petitioner did not testify but admitted through counsel that he had killed Karen Roberts. Petitioner called two witnesses, a psychiatrist and psychologist, to advance a

theory of diminished capacity and asserted that the act at most constituted second-degree murder. After considering the evidence, arguments and instructions, the jury found petitioner guilty of capital murder. At the punishment phase of the trial, the state introduced no additional evidence, but petitioner called a city jail chaplain, petitioner's mother, and his former girl-friend to argue against the death penalty. The jury returned a sentence of death, which was imposed by the Court. More specifically, the jury designated in a handwritten finding the following:

"The evidence showed to the jury unanimously and beyond a reasonable doubt that the defendant did torture Karen Ann Roberts by: shoving her down, then chasing her for two and one-half blocks all the while holding an eight-pound iron bar in his hand and then beat her repeatedly about the upper body and head, causing her death. We, the jury, also find that these actions were outrageously and wantonly vile, horrible and inhuman."

On direct appeal to the Missouri Supreme Court, petitioner's conviction and death sentence were affirmed. *See State v. Smith*, 649 S.W.2d 417 (Mo.1983). Petitioner then commenced a collateral attack on his conviction in the Circuit Court for the City of St. Louis pursuant to Mo.S.Ct.R. 27.26. Petitioner subsequently moved to dismiss that proceeding. On October 5, 1984, the state Circuit Court sustained that motion and dismissed the 27.26 proceeding without conducting a formal hearing on the issue of petitioner's competency to waive his post-conviction remedies. On October 9, 1984, the Missouri Supreme Court held a special session and summoned petitioner to appear before it. At that time, petitioner advised the judges of that court of his wish to abandon further appeals. The Missouri Supreme Court granted petitioner his wish and set his execution for November 9, 1984.

On November 5, 1984, petitioner's brother, Eugene, filed a next-friend petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. On November 6, 1984, this

Court found that a legitimate issue had been raised concerning petitioner's competency and, accordingly, entered an order staying petitioner's execution pending resolution of the competency issue. *See Smith v. Armontrout,* 604 F.Supp. 840 (W.D.Mo. 1984). By agreement of the parties, petitioner was transferred to the Federal Medical Center in Springfield, Missouri, for a comprehensive psychiatric examination and evaluation. A hearing on the issue of Smith's competency was set for March 5, 1985.

Before the competency hearing took place, however, petitioner changed his mind and announced that he wished to pursue his post-conviction remedies. Consequently, the competency question became moot and petitioner was substituted for his brother as the sole petitioner. The Court thereupon treated petitioner's case like any other habeas corpus proceeding. Several months later, it became apparent that petitioner had not exhausted his state court remedies with respect to each of his claims for relief. Accordingly, pursuant to the rule of *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982), this Court had no choice but to dismiss Smith's petition without prejudice and turn the matter over to state courts.

In the meantime, petitioner once again announced that he wanted to abandon all further attacks on his conviction and death sentence. The Missouri Supreme Court promptly set January 6, 1986, as petitioner's execution date. Eugene Smith quickly responded by filing a next-friend petition pursuant to Missouri Supreme Court Rules 27.26 and 52.02 on behalf of petitioner in the Circuit Court for the City of St. Louis. In his petition, Eugene alleged that petitioner was not competent to make a rational decision about abandoning further appeals. At the same time, Eugene filed a motion in the Missouri Supreme Court to stay petitioner's execution pending a current evaluation of his competency. That motion was denied in one line and without any explanation.

Eugene then went back to the Circuit Court for the City of St. Louis and obtained a ruling from Judge Jean Hamilton of that court that a next-friend 27.26 petition was a viable procedure under Missouri law. With Judge Hamilton's ruling in hand, Eugene returned to the Missouri Supreme Court and renewed his motion for a stay of execution until the Circuit Court had a chance to resolve the question of petitioner's competency. The Missouri Supreme Court, on its own motion, postponed the execution date until January 15, 1986. On January 8, 1986, however, the Missouri Supreme Court issued an order which held that the next-friend 27.26 proceeding in state court was a legal nullity and that no further extensions of petitioner's execution date would be granted. The Missouri Supreme Court explained that, in its view, the October, 1984 state court ruling that petitioner was competent foreclosed all further inquiry into the matter. The Missouri Supreme Court did not hold a hearing or invite oral argument before handing down its decision.

In the meantime, Eugene, on December 27, 1985, filed a brand-new next-friend petition in this Court. Again, the question before the Court was whether petitioner was competent to waive his post-conviction remedies. On January 9, 1986—the day after the Missouri Supreme Court washed its hands of petitioner's case—this Court stayed petitioner's execution pending an up-to-date determination of his competency. At the same time, the Court ordered that petitioner be transferred to the Federal Medical Center in Springfield, Missouri, for an updated examination and evaluation. A hearing was set for February 18, 1986.

At this February 18, 1986 hearing, the testimony of six expert witnesses, along with written reports compiled by three non-testifying experts, were received into evidence. Following this three-day hearing, the Court, on April 5, 1986, dismissed the next-friend petition for lack of standing, ruling that petitioner possessed the requisite mental competence to abandon his post-conviction remedies, and that his decision to do so was voluntary. *See Smith v. Armontrout,* 632 F.Supp. 503 (W.D.Mo. 1986). This ruling was affirmed by the Eighth Circuit Court of Appeals on March

2, 1987. *See Smith v. Armontrout*, 812 F.2d 1050 (8th Cir.1987). Petitioner was again scheduled for execution on July 28, 1987.

On July 13, 1987, petitioner filed a 27.26 motion in the St. Louis City Circuit Court in which petitioner noted that he had never had an evidentiary hearing on the merits of his post-conviction collateral attack. The Missouri Supreme Court denied petitioner's 27.26 motion on July 20, 1987, citing to its January 8, 1986 order.

On July 21, 1987, petitioner filed an application for stay of execution with this Court so that he could pursue federal *habeas corpus* relief pursuant to 28 U.S.C. § 2254. Following a teleconference with counsel for the parties on the morning of July 22, 1987, the Court entered a July 22, 1987 order staying petitioner's execution pending the Court's determination of petitioner's federal application for a writ of habeas corpus.

On July 23, 1987, respondents filed a motion to vacate the stay of execution, alleging that petitioner had made a knowing and intelligent waiver of any post-conviction federal habeas relief. On July 23, 1987, the Court overruled respondents' motion to vacate this Court's order staying execution. In so ruling, the Court stated:

"Before the Court is Respondent William Armontrout's motion to vacate the stay of execution of Petitioner Gerald Smith. Respondent argues that Petitioner has knowingly and intelligently waived his right to appeal via the federal habeas corpus statute. Respondent cites to the Court the decision by this Court in *Smith ex rel. Smith v. Armontrout*, 632 F.Supp. 503 (W.D.Mo.1986), *aff'd* 812 F.2d 1050 (8th Cir.1987), *cert. denied* [—— U.S. ——, 107 S.Ct. 3277, 97 L.Ed.2d 781], 55 U.S.L.W. 3872; No. 86–6969 (U.S. June 25, 1987), to stand for the proposition that Petitioner make a knowing and intelligent waiver of his federal habeas rights. Respondent's reliance on *Smith ex rel. Smith* is misplaced and constitutes an incorrect interpretation of this Court's decision.

In *Smith ex rel. Smith*, the very narrow issue before the Court was whether Petitioner was competent to forego further review of his capital murder conviction and death sentence; this Court, unlike the Missouri Supreme Court, has never ruled that Petitioner has in fact waived his right to federal habeas relief. While this Court does not condone Petitioner's 'on-again-off again' approach to his pursuit of his post-conviction remedies, given the unalterably harsh result that will attain from denying Petitioner any substantive review of his post-conviction challenges, the Court concludes that Petitioner may now seek federal habeas relief in this Federal District Court." Court's July 23, 1987 *Order*, pp. 1–2.

This ruling was affirmed by the Eighth Circuit Court of Appeals on July 30, 1987.

In petitioner's amended petition, filed on January 22, 1988, petitioner alleges the following grounds in support of his request for habeas relief:

(1) The aggravating circumstance of "torture" as interpreted by the Missouri Supreme Court resulted in arbitrary and capricious infliction of the death penalty in this case, in violation of the eighth and fourteenth amendments to the United States Constitution;

(2) The trial court's failure to conduct an on-the-record inquiry as to petitioner's voluntary and intelligent consent to a stipulated admission that he wrote the *St. Louis Globe–Democrat* letter violates petitioner's due process rights under the fourteenth amendment to the United States Constitution;

(3) The trial court erred by excluding venirepersons from the jury panel in violation of the rule enunciated in *Witherspoon v. Illinois;*

(4) The trial court erred when it declined to allow petitioner to inquire as to whether the venire panel believed that the death penalty would actually be imposed;

(5) The State's closing argument was improperly inflammatory; and

(6) Petitioner received ineffective assistance of counsel in that:

(a) Counsel stipulated to the authenticity of the *St. Louis Globe–Democrat* letter without petitioner's consent;

(b) Counsel failed to investigate and discover psychiatric medical records resulting from petitioner's stay at the Alexian Brothers Hospital; and

(c) Counsel failed to investigate and interview witnesses to dispute portions of the *St. Louis–Globe Democrat* letter.

On July 11, 1988, the Court held a habeas hearing on petitioner's request for federal habeas relief. At this hearing, petitioner's counsel called two witnesses; in addition, petitioner was examined by counsel. Respondents called three witnesses, including petitioner's counsel during his murder trial, Mr. John Putzel. Following this hearing, the Court took these issues under advisement.

## II. *Waiver*

Respondents continue in their quest for a ruling by this Court that substantive review of petitioner's application for a writ of habeas should be denied based on the fact that petitioner made a knowing and intelligent waiver of his federal habeas rights. However, as previously noted by this Court, this Court is unwilling to preclude petitioner for finally receiving a decision on the merits of his petition based on the technicality of any "waiver" concept.

Moreover, as this Court has previously concluded, other than the Missouri Supreme Court, neither this Court nor the Eighth Circuit Court of Appeals has deemed petitioner's previous "death wish" to be a waiver of any substantive review of the issues now raised in his habeas petition. Thus, the Court will now proceed to rule on the merits of those challenges in the petition.

## III. *Constitutionality of Missouri Death Penalty Statute*

Petitioner's first ground for habeas relief is an allegation that the statutory aggravating circumstance upholding his sentence is unconstitutionally vague in this case because the open-ended construction by the state court allows a jury to impose the death penalty in an arbitrary and capricious manner and fails to narrow the class of people eligible for the death penalty. For the following reasons, the Court finds this challenge to be without merit.

To begin with, since the United States Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and, characteristically, such challenges are upheld where the challenged provision fails adequately to inform juries what they must find to impose the death penalty and, as a result, leaves them and appellate courts with open-ended discretion as to what constitutes an aggravating circumstance. *See, e.g. Godfrey v. Georgia,* 446 U.S. 420, 428–429, 100 S.Ct. 1759, 1764–1765, 64 L.Ed.2d 398 (1980).

Petitioner challenges the law applicable at the time of petitioner's trial which was contained in Mo.Rev.Stat. § 565.012.2(7) (now repealed) which allowed a jury to assess the death penalty if: "The offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." [1]

However, the United States Supreme Court has indicated that statutes such as this one, in which the phrase "[t]he offense was outrageously or wantonly vile, horrible or inhuman" is limited by the requirement that the offense involve "torture," is a sufficient restraint on the arbitrary and capricious infliction of the death penalty in that a finding of torture sufficiently distinguishes those instances where the death penalty is warranted from those instances where it is not. *See Maynard v. Cartwright*, —— U.S. ——, 108 S.Ct. 1853, 1859, 100 L.Ed.2d 372 (1988), *Godfrey v. Georgia,* 446 U.S. 420, 430, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980).

---

1. Under the old statute, there were ten possible statutory aggravating circumstances, one of which was required to be found by the jury to support a death sentence. The present law on the subject, contained in Mo.Rev.Stat. § 565.032 (Supp.1987), expands the number of aggravating circumstances to fourteen, but the language describing the relevant aggravating circumstance has not been changed in the new law.

■ In this particular case, there was ample evidence from which a jury could conclude that the "offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture." In dealing with this issue on direct appeal, the Missouri Supreme Court noted:

"In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the United States Supreme Court upheld the facial validity of a provision substantially indistinguishable from § 565.012.2(7) against Eighth and Fourteenth Amendment challenges. As no authority is advanced for a different interpretation of Missouri's Constitution, we see no reason to reconsider our rejection of defendant's claim in *State v. Blair*, 638 S.W.2d 739, 758 (Mo. banc 1982), and *State v. Newlon*, 627 S.W.2d 606, 621 (Mo. banc 1982), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

In addition [,], it has been held in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), that capital murder statutes must be construed in a manner that the nature of a crime and all of the circumstances justify imposition [of] the death penalty so as not to violate a defendant's rights to freedom from cruel and unusual punishment and the due process of law. In *Godfrey*, a death sentence based on the single aggravating circumstance that two murders were 'outrageously or wantonly vile, horrible or inhumane in that [they] ... involved ... depravity of mind' was reversed when it could not be said the crimes 'reflected a consciousness materially more 'depraved' than that of any person guilty of murder.' 446 U.S. at 433, 100 S.Ct. at 1767. In this case, however, defendant's sentence was not predicated upon a general finding of depravity of mind. On the form in which defendant's punishment was fixed at death, the jury designated, in a handwritten finding, the following aggravating circumstance:

'The evidence showed to the jury unanimously and beyond a reasonable doubt that the defendant did torture Karen Ann Roberts by: [sic] shoving her down, then chasing her for two and one-half blocks [,] all the while holding an eight-pound bar in his hand [,] and then beat[ing] her repeatedly about the upper body and head, causing her death. We [,] the jury also find that these actions were outrageously and wantonly vile, horrible and inhuman.'

"Clearly, there was evidence from which the jury could find beyond a reasonable doubt that defendant intended to cause the victim suffering before her death. In his letter to the *St. Louis Globe–Democrat*, defendant said, "I had a gun on me at the time [,] but I thought shooting would be too damn good for her. I wanted her to feel some pain so I beat her little lousy head in.' The question of whether the defendant caused Karen Ann Roberts to suffer before she died was a jury question, and the evidence was sufficient to submit the issue. The mounting terror and horrible anticipation of a grizzly fate intentionally inflicted by defendant on Karen Roberts as he pursued her over a distance of two and one-half blocks with what she knew was a heavy metal cudgel, together with his initial and repeated bludgeoning of her upper body and head [,] is sufficient beyond a reasonable doubt to constitute an offense 'outrageously or inhumane in that it involved torture' and satisfied the requirement of *Godfrey*. We find § 565.012.2(7) was validly applied in this case." *State v. Smith*, 649 S.W.2d 417, 434 (Mo. banc 1983).

This Court finds the Missouri Supreme Court's analysis of this issue persuasive and, in light of the foregoing reasons, concludes that petitioner's claim that § 565.012.2(7) is constitutionally vague is without merit.

IV. *Stipulated Admission of the St. Louis–Globe Democrat Letter*

■ Similarly, the Court finds equally meritless petitioner's claim that the trial court's failure to conduct an on-the-record inquiry as to petitioner's voluntary and intelligent consent to a stipulated admission that he wrote the letter violates petitioner's due process rights under the Fourteenth

Amendment to the United States Constitution.

Petitioner sets forth the basis of this challenge in his traverse to respondent's response to the Court's show cause order wherein counsel states:

> "The inculpatory *Globe–Democrat* letter was admitted into evidence by stipulation between the state and defense attorneys (TR 484–489). Defense counsel admitted that petitioner wrote the letter (TR 485, 486). Without any inquiry as to whether petitioner had authorized such a damaging admission or if such an admission were intelligently or voluntarily made, the trial court accepted defense counsel's unsupported authority. The following appears at page 489 of the transcript:
>
>> 'THE COURT: I will admit that. Now let me ask, Mr. Putzel, and I know we have discussed this previously, I'm not sure that its clear on the record. With regard to the various stipulations that you have been making as to the authenticity of the letters, as to whatever other facts, I'm assuming that you have discussed these matters with your client and have obtained his approval to make these stipulations? He is aware of your tactics?
>>
>> MR. PUTZEL: He is aware of my tactics in so doing, and aware of the theory behind my tactics.
>>
>> THE COURT: All right fine.'
>
> "Petitioner denies authorizing defense counsel to make the admission he made, either before or after it was admitted into evidence. The admission, by trial counsel and not petitioner constituted a *de facto* confession of the essential elements to prove capital murder and was the basis to support the death sentence. Before the trial court should have accepted this *de facto* guilty plea, it should have conducted an on-the-record inquiry into whether or not the guilty plea was voluntarily and knowingly being made."

*Petitioner's Traverse to Respondent's Response to Order to Show Cause*, p. 24–25.

Petitioner cites Supreme Court Rule 24.-02 as authority for the proposition that the trial court was required to make an on-the-record finding of knowing and intelligent "guilty plea." The argument must be rejected for a number of reasons.

First, Missouri Supreme Court Rule 24.-02 applied only to pleas of guilty and not to admissions as to the authenticity of documents. Petitioner's argument that the admission constituted a *de facto* confession or guilty plea to the essential elements of capital murder strains reason and must be rejected by the Court. Stipulating that the *St. Louis–Globe Democrat* letter was in fact written by defendant did not, by itself, constitute a guilty plea to the crime of capital murder, that was aggravated under § 565.012.2(7) so as to justify the imposition of the death penalty. Rather, it was the admission of the letter, along with other physical evidence and testimony considered by the jury which led to *a conviction* of petitioner, not a plea of guilty. Thus, to the extent that petitioner relies on Supreme Court Rule 24.02 as authority for imposing such a duty upon the trial court, the Court finds petitioner's position to be meritless.

Additionally, as noted by respondent, since the prosecution was prepared to offer evidence showing that petitioner's fingerprints were on the letter and that the letter was in petitioner's handwriting, petitioner has failed to sufficiently demonstrate that there is a reasonable probability that, but for the error, the outcome of the proceeding would have been different. *See Hamilton v. Nix*, 809 F.2d 463, 470 (8th Cir.1987) (en banc); *Crespo v. Armontrout*, 818 F.2d 684, 687 (8th Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 492, 98 L.Ed.2d 490 (1987). Thus, to the extent that petitioner alleges that the due process clause imposes of such a duty upon the trial court, the Court finds that petitioner has failed to demonstrate any prejudice resulting from the admission.

V. *The Exclusion of Venirepersons From the Jury Panel*

Petitioner's next ground for habeas relief is that the trial court erred by excluding venirepersons from the jury panel in viola-

tion of the rule enunciated in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and its progeny. For the following reasons, the Court concludes that habeas relief on this ground must be denied.

In *Witherspoon*, the United States Supreme Court held:

"... that a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death. (footnote omitted) Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding venire[persons] for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. (footnote omitted) No defendant can constitutionally be put to death at the hands of a tribunal so selected." (footnote omitted) 391 U.S. at 521–523, 88 S.Ct. at 1776–1777.

In expounding on this holding, the Supreme Court noted:

"Just as venire[persons] cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that venire[persons] were excluded on any broader bases than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support a narrower ground of exclusion. . . .

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only venire[persons] who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the .death penalty would prevent them from making an impartial decision as to the defendant's *guilt*. . . ." *Id.* n. 21, 88 S.Ct. at 1777, n. 21 (emphasis in the original).

In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court modified this standard somewhat by holding that a juror with personal objections to the death penalty may be excused for cause only if it is shown that his views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 45, 100 S.Ct. at 2526.

In light of that backdrop, the Court must now consider petitioner's *Witherspoon* challenges. Petitioner challenges the striking for cause of three venirepersons—Helen Sadowski, Maude Adams and Veuncil Powell—from the jury panel. As to venireperson Sadowski, the relevant portions of the voir dire are as follows:

"Is there anyone that feels that you would either be unable to return a verdict of capital murder or unable to consider assessing the death penalty in this case?

Okay, that's Miss Sadowski?

VENIREPERSON SADOWSKI: Yes.

MR. BAUER: All right. Could you consider the death penalty in any case?

VENIREPERSON SADOWSKI: I don't think so."

Transcript p. 100.

Later, at transcript pages 118–120, the following colloquy occurred:

"I would like to ask some of the jurors who responded to the prosecutor's ques-

tions about their feelings about the death penalty.

Mrs. Sadowski, you indicated that you oppose the death penalty?

VENIREPERSON SADOWSKI: (Shaking head)

MR. PUTZEL: Can I ask you on what basis you have that belief or—

VENIREPERSON SADOWSKI: I just don't think I could do it, just something inside—I don't know.

MR. PUTZEL: Okay, that's fair enough. You realize that when you're called to serve as a juror, that you are performing a civic duty?

VENIREPERSON SADOWSKI: Yes.

MR. PUTZEL: Or you will be instructed also on second degree and manslaughter, and it could only be in the circumstances where you found him guilty of·capital murder that you would be called upon to consider whether the death penalty was appropriate. All right?

VENIREPERSON SADOWSKI: Right. I understand that.

MR. PUTZEL: Knowing that that's the case, do you believe that you could consider, although again not necessarily vote for, the death penalty if the evidence were sufficient to convince you that Jerry Smith is guilty of capital murder?

VENIREPERSON SADOWSKI: I don't just think I could.

MR. PUTZEL: You are stating that there is no circumstance?

VENIREPERSON SADOWSKI: I said I would try, but I just don't believe that I could do it, I really don't.

MR. PUTZEL: Are you saying you don't believe you could impose the death penalty, or that you couldn't consider it? Because it's an important distinction.

VENIREPERSON SADOWSKI: I don't think that I could even consider it.

MR. PUTZEL: Okay, thank you very much[,] Mrs. Sadowski."

As to venireperson Adams, the following colloquy took place during voir dire:

MR. BAUER: Ms. Adams?

VENIREPERSON ADAMS: Could not.

MR. BAUER: All right. Same question. Under any ·circumstances[,] could you consider returning an assessment of the ' death penalty?

VENIREPERSON ADAMS: I don't believe so in fairness.

MR. BAUER: Pardon me?

VENIREPERSON ADAMS: In fairness[,] I don't think so."

*Transcript*, p. 101.

Later, at transcript pages 121–122, Miss Adams was asked additional questions:

"MR. PUTZEL: ... Miss Adams?

VENIREPERSON ADAMS: (No. 18) (Shaking head).

MR. PUTZEL: Obviously by this point you're familiar with the kind of question I'm asking; and again, the distinction I am making is an important one both from Jerry Smith's point of view as well as from your understanding of· the law.

Is there any circumstance under which you could consider imposing the death penalty if you found the person guilty of capital murder? Again, that's not to say you would find them—

VENIREPERSON ADAMS: (No. 18) I wouldn't want to.

MR. PUTZEL: Well, I will be honest with you, I'm a defense lawyer, obviously, and I wouldn't want to and I don't think prosecutors do either. It's a difficult decision. The question is, could you consider the two alternative punishments which is not the same as saying would you give him the death penalty; but could you consider those?

VENIREPERSON ADAMS: (Shaking head)

MR. PUTZEL: Okay. You could not? Thank you very much.

One closing question, Miss Adams, is there any circumstance in your own mind which you can think of where, for instance a mass murder or a person with a long history of murder convictions, where you could consider imposing the death penalty?

VENIREPERSON ADAMS: That would depend.

MR. PUTZEL: So is it fair to say that there are some circumstances in which you could consider the death penalty, if not necessarily convince yourself to impose it?

VENIREPERSON ADAMS: I still don't think I could."

Finally, as to Venireperson Powell, the following dialogue appears at pages 155–156 of the transcript:

"MR. BAUER: Okay. I thought you said something else about judging somebody that may be important. Could you repeat it for me?

VENIREPERSON POWELL: I just said I don't have the right to really judge anybody.

MR. BAUER: Let me ask you another question, then. And that is, that the duty of the jury is not necessarily to judge him as an individual, but to judge from the evidence whether or not he is guilty of the particular crime.

VENIREPERSON POWELL: I know what it is and just like I said, I don't know if I can judge that because in our church we don't believe in judging people."

Later, at pages 159–162 of the transcript, this dialogue continued:

"Is there anyone that would have a hard time returning a verdict of capital murder even though you would, in your own mind, know that he has been proven guilty beyond a reasonable doubt? Okay, Miss Powell?

VENIREPERSON POWELL: (Shaking head)

MR. BAUER: Do you believe that even though you would know in your mind that he has been proven guilty beyond a reasonable doubt? You could not find him guilty of capital murder?

VENIREPERSON POWELL: That's right.

MR. BAUER: Would that apply to any defendant or just this particular person?

VENIREPERSON POWELL: Anyone. Like I said, I don't have a right to judge people.

\*      \*      \*      \*      \*      \*

Miss Powell and Miss Nebbitt, would you be unable to follow these instructions? You have to speak up?

VENIREPERSON POWELL: I just wouldn't judge nobody because the *Bible* tells you not to judge one another.

MR. BAUER: Would that be a yes you could not?

VENIREPERSON POWELL: Because no matter what you would say in court there's always going to be a doubt; maybe a witness somewhere that didn't know about the trial might show up.

MR. BAUER: Well[,] now[,] you understand—

VENIREPERSON POWELL: So there's always—

MR. BAUER: Let me explain one thing to you. The State and the defense has subpoena power to bring in any witness that we want.

VENIREPERSON POWELL: There might be a witness that seen [sic] something and didn't come forward.

MR. BAUER: Um hum.

VENIREPERSON POWELL: And then[,] maybe[,] at the last minute if they had known, they could have come forward and saved the boy's life or saved the woman's death.

MR. BAUER: Well the woman's life in this particular case is over.

VENIREPERSON POWELL: I'm just saying anybody that would be on trial, maybe at the last minute say, like you sentence someone, maybe a month later somebody is reading the paper about it and they would say, 'Oh yeah, I seen [sic] this person so and so place at the time it happened,' okay? The person serving time is locked up and you know to be locked up ain't [sic] no fun."

Over petitioner's counsel's objections, the trial court sustained the prosecutor's motion to strike venirepersons Sadowski, Adams and Powell for cause.

■ Having analyzed the voir dire of these venirepersons in light of the standards set forth in *Witherspoon* and its progeny, the Court concludes that there was no *Witherspoon* violation in this case.

In all three instances, the venirepersons made it unquestionably and unmistakably clear, following lengthy voir dire by counsel, that they had strong objections against rendering death sentence even if such a sentence was indeed supported by the evidence. Thus, this examination of the venireperson shows that the views held by these persons "would [have] prevent[ed] (or at a minimum would have) substantially impair[ed]" their performance of their duties as jurors.

Petitioner, however, argues that the venirepersons' responses, which at some points amounted to answers such as "I don't think so," were equivocal and, as such, did not unquestionably and unmistakenly demonstrate that these potential jurors could fulfill their obligations. However, in rejecting a similar argument raised in a prior habeas petition decided by this Court, the undersigned Judge noted the following:

"On petition for habeas corpus, the question of challenge of a prospective juror for bias is a factual issue. [*Wainwright v.*] *Witt*, [469 U.S. 412], 105 S.Ct. [844] at 855 [83 L.Ed.2d 841 (1985)]. A federal court reviewing the petition under 28 U.S.C. § 2254(d) is required to accord a presumption of correctness to state court's findings of fact. (citations omitted) Thus, in determining whether this venireperson would be able to 'faithfully and impartially' apply the law, deference must be paid to the trial judge who was able to personally observe the juror. (citations omitted) The Missouri Supreme Court found that a certain person's response 'I don't think so' was not equivocal; but, rather, was common vernacular to express a negative. (citation omitted) Thus, the Court finds no basis for overruling the state court's factual findings on the issue of exclusion of jurors for bias against the death penalty." *Mercer v. Armontrout*, 643 F.Supp. 1021, 1023 (W.D.Mo.1986).

Thus, in light of the deference granted to the trial judge who was present to observe the jurors and the presumption of correctness as to a state court's findings of fact, the Court concludes that the responses of venirepersons Sadowski, Adams and Powell unequivocally established that they would not be able to abide by their oaths and fulfill their obligations as jurors, even though they responded by saying "I don't think so."

## VI. *Failure to Allow Inquiry as to Whether Death Would be Imposed*

Petitioner next alleges that the trial court erred when it declined to allow petitioner to inquire as to whether the venire panel believed that the death penalty would actually be imposed. According to petitioner, the trial court's failure to explore the possibility that some jurors might trivialize their responsibility or think that a death sentence might be something less than death (and thus would more freely impose the penalty) denied petitioner due process in violation of the fifth, sixth and fourteenth amendments to the United States Constitution. For the following reasons, the Court concludes that petitioner's challenge on this ground is without merit.

To begin with, the law is clear that a trial judge has wide latitude in deciding what questions can and cannot be asked during voir dire, and the failure to ask a particular question will be reversed only if there is an abuse of discretion. *U.S. v. Carter*, 804 F.2d 487, 490 (8th Cir.1986) (District court has broad discretion in the propounding of voir dire interrogatories); *U.S. v. Harvey*, 756 F.2d 636, 640 (8th Cir.1985) (District court has broad discretion to conduct voir dire and error exists only if abuse of discretion resulted in substantial prejudice to defendant); *see also U.S. v. Click*, 807 F.2d 847, 850 (9th Cir.1987) (In conducting voir dire in criminal prosecution, trial judge has wide latitude, and failure to ask specific questions will be reversed only if there is abuse of discretion); *State v. Taylor*, 742 S.W.2d 625, 627 (Mo.App.1988) (Trial court is given broad discretion in controlling voir dire, especially concerning nature, extent and propriety of questions addressed to venirepersons).

Therefore, petitioner not only has the burden of showing that the trial court's failure to ask this question during voir dire was an abuse of discretion resulting in

substantial prejudice, but he also must show that this substantial prejudice resulted in a violation of his right to due process. In this case, petitioner clearly has not made a showing of this magnitude.

In addressing this issue on direct appeal, the Missouri Supreme Court noted:

"Defendant next contends the trial court erred in sustaining the state's objection to defense counsel's inquiry during voir dire as to whether the potential jurors believed that a death sentence, if assessed, would be carried out. Defendant argues the paucity of executions in the United States has received wide publicity[,] and a venire[person]'s belief that a death sentence will not be carried out could substantially affect his decision on punishment; hence the proposed question had a legitimate purpose and should have been allowed.

"The purpose of voir dire is to enable each party to participate in [the] selection of a fair and impartial jury[,] and to that end, wide latitude is allowed in examination of the panel. *State v. Lumsden*, 589 S.W.2d 226, 229 (Mo. banc 1979). During voir dire the defendant should be permitted to develop not only facts which might manifest bias and form the basis of a challenge for cause, but also such facts as might be useful to him in detecting the possibility of bias and intelligently utilizing his peremptory challenges. (citations omitted) Nevertheless, the examination of jurors as to their qualifications is conducted under the supervision of the trial court[,] and the nature and extent of the questions counsel may ask are discretionary with that court. (citations omitted) Rulings of the trial court during voir dire will be disturbed on appeal only when the record shows an abuse of discretion ... and a real probability of injury to the complaining party. (citation omitted).

"The pertinent portion of the voir dire proceeded as follows:

'MR. PUTZEL: How many of you believe that if you, in this case, were to find Jerry Smith guilty of capital murder and if you were to assess the death penalty, how many of you believe that Jerry Smith would be executed?

MR. BAUER: Your Honor, I object.

THE COURT: That will be sustained.'

"During the subsequent discussion, the trial court explained its ruling:

'THE COURT: ... The Court is not going to permit that question for the reason that it constitutes[,] in the Court's position, a disparagement of the administration of justice, and that it is a kind of question that plants a doubt in the minds of the jury about the law being carried out in this state. And for that reason[,] I consider it to be an improper question and it is not an appropriate question, and the question is not going to be asked of future sections of the venire.'

\*   \*   \*   \*   \*   \*

"In *State v. Olinghouse*, 605 S.W.2d 58, 69 (Mo. banc 1980), this Court held the trial court did not err in refusing to allow defense counsel to inquire of the venire[persons] whether they knew the penalty of life imprisonment for capital murder did not include the possibility of parole for fifty years. Defendant there contended that the question would have permitted him to ascertain the existence of prejudice that might cause a juror to find the defendant guilty of capital murder rather than a lesser offense for which the possibility of parole existed. Nevertheless, we concluded:

'... The question of future clemency is extraneous to a proper determination of issues of guilt and punishment by the jury. It should be of no concern to them....

Inasmuch as the proposed inquiry and the request for further instruction by the court related to matters of 'no concern' to the jury, the trial court did not abuse its discretion in its ruling.' 605 S.W.2d at 69.

Similarly, in the case at bar, factors such as commutation, reversal of sentence on appeal or protracted litigation by the defendant which might delay or prevent execution of a death sentence were extraneous to a proper determination of guilt and punishment by the jury, and

the court did not abuse its discretion in determining that the impropriety of jury speculation on such matters outweighed any potential benefit to the defendant. Defendant's contention is denied." *State v. Smith*, 649 S.W.2d at 427–429.

The Court finds this reasoning by the Missouri Supreme Court persuasive and, thus, concludes that since the trial court did not abuse its discretion in disallowing this question, then petitioner has failed to demonstrate any prejudice which rises to the level of any fifth, sixth or fourteenth amendment violation.

### VII. *Improper Closing Argument*

Petitioner also alleges that the State's closing argument was improperly inflammatory, and, therefore, violated petitioner's right to due process under the fifth and fourteenth amendments to the United States Constitution. For the following reasons, this contention by petitioner must be rejected.

The relevant portions of the state prosecutor's closing argument, which occurred during the penalty phase of the trial, are as follows:

"You, as you sit here now, represent society. You represent the City of St. Louis, your community. It's a heavy burden on your shoulders, a burden that must be borne. What will be accomplished by this case? Karen Roberts is dead. No one can change that. Although we may like to. Gerald Smith is alive. If the death penalty has any value, it is that it acts as a deterrent for others to perhaps not do this type of crime and this is the type of crime that it will have a deterrent affect on because this is the kind of crime that is planned ahead.

This is the kind of crime where there's an opportunity for the person to think about not doing it. What the death penalty does is protect society, protects the members of the City of St. Louis. Because if someone, somewhere has some reason that he wants to kill somebody but he says to himself, 'If I do, I may well die,' that just may save an innocent life. It just may.

So we will be accomplishing something. Karen Roberts will not have died for nothing. I wish she were alive today, but she is not. Perhaps by her death something can be accomplished that another life will not be taken. Another victim will not become a victim. If only one innocent life is saved, then we have accomplished something very important. We have saved an innocent life. It's a gamble; maybe it will work, maybe it won't—nobody knows for sure. But it just might. And if it doesn't, then we've put to death a cold-blooded killer. Which is more important?

\*     \*     \*     \*     \*     \*

A community does place the value that it places on human life by how it treats those who take human life premeditatively and deliberately. Don't sell an innocent life cheap. Let the people know the citizens of St. Louis care about human life. We don't just throw them away, we try to save as much as we can.

\*     \*     \*     \*     \*     \*

Think to yourself, for a half a block the terror that was going through her mind as he was chasing her. For another half a block, for another block down the railroad tracks and another half a block until he beat her head in, until she died. Think about her screams, think about what he may have been screaming at her when she asks you to save his life. And perhaps if you spare his life another innocent life will be lost. Perhaps if you don't spare his life other innocent lives can be saved.

That's the reason, aside from this damage that he's done—which is reason enough—for the death penalty. But there's a better reason; and that is to hopefully save someone else." *Transcript*, pp. 671–673.

■   As noted by counsel, in reviewing the question of whether a particular closing argument is improper, thereby rising to the level of a due process violation, the Court must determine "whether the prosecutor's comments so infected the trial with unfairness as to make the resulting convic-

tion a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974). Thus, on habeas review, a petitioner not only must demonstrate an error on the prosecutor's part, but he must also demonstrate that the error resulted in prejudice rising to a constitutional level, resulting in a denial of fundamental fairness. *See, Donnelly v. DeChristoforo*, 416 U.S. at 642, 94 S.Ct. at 1872.

In this case, petitioner argues that this argument was calculated to arouse the passions and prejudices of the jury and was improperly inflammatory in that it suggested that petitioner should die because the prosecutor thought that petitioner might kill others in the future if he got a life sentence. However, petitioner's interpretation of the prosecutor's closing argument must be rejected.

■ As the Court interprets the prosecutor's closing argument from the quoted portions of the transcript, the thrust of the argument was that other lives would (or could) be saved by sentencing petitioner to death because of the deterrent effect that this sentence would have on other would-be killers. Nothing in that argument suggests that petitioner should be killed so that he would be prevented from taking other lives in the future. And, as noted by respondent, it is both proper and appropriate for a prosecutor to discuss the purposes of punishment during the penalty phase of the trial. *See, e.g. Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir.1986); *Drake v. Kemp*, 762 F.2d 1449, 1458 (11th Cir.1985) (en banc), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986).

Thus, petitioner's claim that this closing argument resulted in substantial prejudice to him is without merit.

### VIII. *Petitioner's Ineffective Assistance of Counsel Claim*

Finally, petitioner alleges that he received ineffective assistance of counsel in that:

(a) Counsel stipulated to authenticity of the *St. Louis–Glob Democrat* letter without petitioner's consent;

(b) Counsel failed to investigate and discover psychiatric medical records resulting from petitioner's stay at Alexian Brothers Hospital; and

(c) Counsel failed to investigate and interview witnesses to dispute portions of the *St. Louis–Globe Democrat* letter.

For the following reasons, the Court concludes that petitioner's ineffective assistance of counsel claim must be rejected.

Preliminarily, it should be noted that the standard for determining whether an individual has received ineffective assistance of counsel is set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to show that he was denied ineffective assistance of counsel of constitutional dimension:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." 466 U.S. at 687, 104 S.Ct. at 2064.

A reasonableness standard is used by the courts to determine whether counsel has rendered constitutionally effective assistance, and this reasonably effective assistance may be defined as "the skill and diligence that a reasonably competent attorney would exercise under similar circumstance...." *Thomas v. Lockhart*, 738 F.2d 304, 307 (8th Cir.1984), *quoted in Kellogg v. Scurr*, 741 F.2d 1099, 1100 (8th Cir.1984).

The *Strickland* court further noted that in determining whether assistance rendered by counsel is ineffective, a court should give deference to counsel's decision and eliminate the distortion of hindsight. 466 U.S. at 689, 104 S.Ct. at 2065. Thus, the Court instructed that:

> "Because of the difficulties inherent in making the evaluation, a court must indulge in a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance—that is, a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689, 104 S.Ct. at 2065–2066 (emphasis added).

In describing defense counsel's duty to investigate, the Court in *Strickland* noted that:

> "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness under all the circumstances, applying a heavy measure of deference to counsel's judgment." 466 U.S. at 691, 104 S.Ct. at 2066.

Thus, as noted by the Eighth Circuit Court of Appeals:

> "... the fact that mitigating evidence is not set forth does not inexorably lead to a conclusion of ineffective counsel. One must look further as to why the mitigating evidence was not produced. If counsel has through neglect failed to discover such evidence, then counsel will be found ineffective. If, however, the mitigating evidence is not produced because counsel, after reasonable investigation and exercise of professional judgment, has determined that withholding such evidence is a more strategically sound course, then there is no ineffectiveness." *Laws v. Armontrout*, 834 F.2d 1401, 1410 (8th Cir.1987).

In light of the foregoing background, the Court will address each of petitioner's inef-

fective assistance of counsel claims separately.

A. *Stipulation of the Globe–Democrat Letter*

Petitioner first alleges that counsel's admission, without petitioner's approval, that the letter sent to the *St. Louis Globe–Democrat* was written by petitioner amounted to ineffective assistance of counsel in violation of the sixth amendment of the United States Constitution. However, in light of the testimony offered by the parties during this Court's July 11, 1988 hearing, the Court concludes that contention by petitioner must be rejected.

At this July 11th hearing, counsel for petitioner, Mr. John Putzel, testified that there were numerous tactical reasons for entering into a stipulation as to the genuineness of the *St. Louis Globe–Democrat* letter. First, counsel testified that one major reason for the stipulation was to head off the admission of a more damaging letter allegedly written by petitioner to the St. Louis Prosecutor's Office, wherein the author stated that he would kill all the witnesses, the judge and all of the jurors to insure that he would get the death penalty, as opposed to life imprisonment. Counsel stated that this letter would have been admitted to show that both it and the *St. Louis Globe–Democrat* letter were written by the same individual, i.e., by petitioner. In addition, counsel testified that by stipulating to the admission of the *Globe–Democrat* letter, it was his intention to de-emphasize the importance of it and to downplay the prosecutor's effort to highlight the contents of the letter by way of handwriting and other experts who would have testified that petitioner did, in fact, write the letter.

■ In light of this testimony by counsel and in light of the strong presumption of reasonableness which attaches to an attorney's trial strategy, this Court cannot conclude that counsel's stipulation to the admission of the *Globe–Democrat* letter fell below the acceptable range of reasonable professional assistance. Thus, petitioner's claim that counsel's stipulation amounted

to ineffective assistance of counsel must be rejected.

■ Additionally, as previously noted by the Court, the prosecution was prepared to offer evidence showing that petitioner's fingerprints were on the letter and that the letter was written in petitioner's handwriting, thereby making the letter properly authenticated and admissible. Thus, even if the Court were to conclude that counsel's conduct fell below the standard of reasonableness, petitioner has failed to show any resulting prejudice as a result of the stipulation. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

B. Petitioner's Records from the Alexian Brothers Hospital

Petitioner also alleges that counsel rendered ineffective assistance of counsel by failing to investigate and discover the existence of medical records from the Alexian Brothers Hospital where petitioner had been admitted on three occasions immediately preceding his arrest for the murder of Karen Roberts. Petitioner notes that these hospital admissions were for psychiatric treatment resulting from attempted suicide, severe depression and inability to control his hostility and, thus, were relevant to petitioner's defense of diminished capacity or inability to have premeditated prior to the killing. Petitioner further alleges that had his testifying expert, Dr. Sam Parwatikar, had access to these medical records prior to giving his testimony at trial, Dr. Parwatikar would have offered a different opinion as to petitioner's mental state both during, and shortly before, the time that Karen Roberts was killed. However, based on the testimony by Mr. Putzel at the July 11th hearing, the Court concludes that counsel was not ineffective.

First, counsel testified that he had investigated and had obtained copies of the Alexian Brothers Hospital records prior to trial. Thus, petitioner's claim that counsel was ineffective because he failed to investigate and discover the hospital records is completely meritless.

Second, counsel testified that the reason that he did not want the Alexian Brothers medical records brought before the jury was that these records contained numerous prior acts of violence by petitioner, which he felt would be prejudicial to petitioner. Furthermore, counsel testified that he was informed by Dr. Parwatikar that he did not need a copy of the Alexian Brothers Hospital records to render his opinion regarding petitioner's mental state at the time that petitioner killed Karen Roberts. Thus, counsel was of the opinion that the presentation of this additional evidence would be cumulative and unnecessary.

■ Again, this Court is not in a position (nor should it be) to second-guess counsel's tactical decision to withhold the presentation of such evidence to the jury. In any event, the Court can't, based upon this testimony, conclude that such strategy by counsel was so unreasonable that it fell below the constitutional threshold of effective assistance. Thus, petitioner's claim that counsel rendered ineffective assistance by failing to investigate and discover the Alexian Brothers Hospital records is equally meritless.

C. Counsel's Failure to Discover Witnesses to Dispute the Globe–Democrat Letter

Petitioner's final ground for relief is an allegation that counsel rendered ineffective assistance of counsel because counsel did not investigate information that would have supported his a defense that the *Globe–Democrat* letter was false or that it was written as a dare rather than as an accurate statement as to the facts surrounding the murder and as a statement of petitioner's intent at the time of the killing. However, for a number of reasons, the Court concludes that counsel did not act ineffectively.

The episode which petitioner complains about appears at pages 651–656 of the

transcript in which the following dialogue took place between the trial court and counsel:

"MR. PUTZEL: As you may have noticed, Mary Louise Moran and one of the attorneys from the Public Defender's Office came up about 45 minutes or an hour ago and told me that our office had received a call from a man by the name of Walter Hagen. It is my understanding Mr. Hagen was an inmate at the city jail during the period of time that Jerry Smith had been locked up in the city jail. That Mr. Hagen was present at the time Jerry Smith wrote the letter to the *Globe–Democrat*, as well as apparently drafting a letter or other letters to television stations and other media agents in the St. Louis area.

My understanding is that from speaking briefly on the phone, which is who [sic] I was talking to when I was called out of the room, it was done as a joke, on a bet, and that present at the time that letter, as well as the letter that was received by the *Globe–Democrat*, as well as other letters that were drafted, was a man by the name of Harry Cornell (phonetic) who is a guard at the city jail. I have no idea, obviously, with respect to the truth or not of any of this information, and it came to my attention[,] as the Court knows[,] 45 minutes ago.

MR. BAUER: Your Honor, my suggestion would be that Mr. Putzell be given over the noon hour lunch-break or whatever to see if he can contact Mr. Hagen and find out if this is another joke or what, and determine the value of whatever the testimony may or may not be. And then go from there.

THE COURT: Well, I've just directed the Sheriff to take the jurors to lunch before we proceed, and he advises me that to be on the safe side in order—because he had not been able to make earlier arrangements, we had better recess until at least 1:30. That's an hour and a half, see what you can find out during that time, John. Then we will discuss it further."

After a short recess, this dialogue continued:

"THE COURT: Mr. Putzell, go ahead.

MR. PUTZELL: On this day, June 5, 1981, I was notified around eleven o'clock in the morning by Mary Louise Moran of the Public Defender's Office that she had received a phone call from a Walter Hagen, I think it is a capital h dash a dash g dash a dash n or capital h dash a dash g dash d dash n dash s, one of the two, stating that he had information regarding the Jerry Smith murder trial. I have[,] since that time[,] spoken to Walter Hagen on the telephone twice, most recently approximately one o'clock today, 1:00 p.m. today.

Mr. Hagen told me that he was in the city jail with Jerry Smith during the beginning or over a certain period of time[,] including the first week or so of the month of March, 1981. That during that time he observed a letter which had been written by Jerry Smith to the *Globe–Democrat* on what Mr. Hagen said was white, lined, [sic] stationery of the sort provided in the jail, indicating an admission with respect, apparently, to the killing of Karen Roberts and a number of other things about the circumstance of that killing.

He stated also that he saw a letter which had been written by Dempsy Williams (phonetic) who was also an inmate in the jail at that time, a black man, also a letter to the *Globe–Democrat* indicating Jerry Smith's complicity in the killing of Karen Roberts. That letter, I think, I said being written on legal-sized white or yellow paper. He indicated that he believed that Jerry Smith had apparently signed that letter: "Jerry Smith–Gerald Smith, cold-blooded killer." Although I have to say that my conversation with him in that regard was not clear. He stated also that Jerry Smith had said to him when he was drafting the letter on the white stationery-sized paper, that as long as they were going to kill him[,] he might as well go ahead and give them a good reason to do it. And that it was[,] by Mr. Hagen's estimation,

done as a joke or on a dare—I mean on a bet, and that's as much as I know about the case.

I am aware also that we, the Public Defender's Office, represented one Dempsey Williams. Whether he is the same Dempsey Williams mentioned by Mr. Hagen, I'm not sure. Although I have some reason to think he is. And he was recently released from the city jail.

THE COURT: First of all, it's my understanding that before the stipulation was made regarding the authorship and authenticity of the letter, that the State, in preparing this case for trial, had obtained handwriting samples and had a witness ready to testify that the writing and printing on the letter and the envelope were that—were the same as other documents written and printed by the defendant.

MR. BAUER: That's correct.

THE COURT: And also that the State had identified the defendant's fingerprints from the letter.

MR. BAUER: In three different places.

THE COURT: And that it was on the basis of being informed that the information, that stipulation as to authenticity and authorship, was made. Is that my understanding?

MR. PUTZELL: That's correct.

THE COURT: In view of this development, what do you want me to do, Mr. Putzell?

MR. PUTZELL: I would state only briefly that given the limited amount of time I have had to check out Mr. Hagens' information, I can't be certain of its value. Although I think given our argument in the case, on the guilt phase that intent or the premeditation was of the essence of the case, that our investigation of the circumstances set out by Mr. Hagen might very well have a significant bearing on the defendant's intent in either sending or writing the letter, or sending the letter even if it were written by someone else. To that end, I would move for a mistrial on the basis of newly discovered evidence.

MR. BAUER: Your Honor, at this point I think it should be put into the record, at least, that on Monday of this week I received a letter purporting to have been written by the defendant, and although I am a layman, I have seen several examples of this writing and I believe that this came from him. The actual proof of which will have to be done later. But the content of that letter, basically, is that by the time I received the letter, the trial would have been started, that the defendant would have told me in person but his lawyer did not want him to testify, and that he meant every word in the letter to the *Globe-Democrat* of March 14.

MR. PUTZELL: I will agree that that's the gist of the letter received by Mr. Bauer that he showed me.

MR. BAUER: It's not word for word.

MR. PUTZELL: He showed me the letter, and I have a copy of it.

THE COURT: I saw the letter too, and I ruled it would not be permitted in evidence because it reflected upon the defendant's desire to testify or failure to testify. I'm going to overcome any motion for mistrial at this state, [sic] on the basis of this late information, [sic] because[,] frankly[,] assuming as true everything that you stated, these portions of what Mr. Hagen said to you that would constitute admissible evidence, it doesn't seem to me would[,] in any way[,] materially affect the verdict that's been received."

█  As demonstrated by the transcript, counsel for petitioner was completely unaware of the existence of Mr. Hagen, and counsel testified at the July 11th hearing that petitioner never informed him of the existence of such a witness. Upon finding out, through an attorney at the St. Louis Public Defender's Office, of Hagen's existence, counsel promptly sought to contact this witness and promptly moved for a mistrial based upon newly discovered evidence, which was denied by the trial court.

Thus, in light of petitioner's failure to inform counsel of Hagen's existence, and in light of counsel's diligent effort to seek a mistrial when Hagen's existence and testi-

mony came to light, the Court finds that there was no ineffective assistance on counsel's part in failing to track down Mr. Hagen and present his testimony at trial.

### IX. *Conclusion*

On July 11, 1988, at the hearing in this cause, the petitioner's attorney was given additional time to locate the witness, Walter Hagen, for the purpose of interviewing him and taking his deposition to determine if there was any further information that the witness Hagen could supply in regard to the letter that was written by the petitioner to the *St. Louis Globe–Democrat.* On August 8, 1988, this Court was informed by the petitioner's attorney that the witness Hagen could not be located and that the attorney had been informed that witness Hagen did not want to be located.

For the reasons herein stated, it is hereby

ORDERED that the petitioner's motion for writ of habeas corpus is denied.